UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X

SYMBOL TECHNOLOGIES, INC.

                Plaintiff,

    -against-                             **ORDER**
                                              **CV-04-4863(SJF)(AKT)**

BRIAN BURKE,

                Defendant.
---------------------------------------------------------X
FEUERSTEIN, J.

On November 9, 2004, Symbol Technologies, Inc. ("plaintiff") commenced this action against defendant Brian Burke ("Burke")[1] alleging claims, *inter alia*, for breach of fiduciary duty, unjust enrichment, fraud and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d). Plaintiff now moves pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure for the entry of a default judgment against Burke. For the reasons stated herein, plaintiff's motion is granted.

I. BACKGROUND

    A.    Factual Background

Plaintiff is a public company whose shares trade on the New York Stock Exchange. (Complaint [Compl.], ¶ 3). Between May 1997 and May 2002, Burke served in the following

---

[1] Although the complaint originally named three additional defendants, the claims asserted against, and by, those individuals have subsequently been dismissed pursuant to a notice of voluntary dismissal filed March 24, 2008 and "so ordered" stipulations dated December 22, 2009 and January 6, 2010, respectively. Accordingly, Burke is the only remaining defendant in this action.

1

capacities for plaintiff: chief accounting officer from May 1997 to January 3, 2000; senior vice president and general manager of worldwide operations until October 7, 2001; and senior vice president, corporate development until May 24, 2002. (Compl., ¶ 6).

In April 2001, the SEC received an anonymous letter alleging that plaintiff was engaging in improper accounting practices. (Compl., ¶¶ 19, 142). In May 2001, plaintiff retained a law firm to conduct an investigation into those allegations. (Compl., ¶ 143). In March 2002, plaintiff retained a different law firm to conduct the investigation, which retained a team of forensic accountants. (Compl., ¶ 144).

Plaintiff alleges that on December 30, 2002, as a result "of more than two years of internal investigation by [plaintiff's] counsel, and of related investigations by the Eastern District and the SEC," (Compl., ¶ 19), it restated its revenues for the calendar years 1998 through 2001, in addition to the first three quarters of 2002, resulting in "a reversal of cumulative net revenue of approximately $234.2 million and cumulative net earnings of $324.7 million that had been reported previously." (Compl., ¶ 18; see also ¶ 24). Some of the wrongful acts plaintiff alleges that Burke committed include, *inter alia*: (1) devising a process, known as the "Tango process," pursuant to which Burke and his alleged co-conspirators would create illegitimate accounting journal entries to create the false appearance that plaintiff had met analysts' expectations and to overstate plaintiff's revenue and earnings, (Compl., ¶¶ 51-61); (2) arranging "candy deals," described as "three-way, 'round-trip' transactions at the end of quarters in order falsely to overstate [plaintiff's] reported revenue and earnings," (Compl., ¶¶ 62-70); (3) entering into "channel stuffing" transactions, pursuant to which plaintiff recognized revenue on sales to certain distributors even though the distributors had no obligation to pay for the products they purportedly purchased," (Compl., ¶¶ 71-106); (4) reclassifying accounts receivable as debt, in

2

order to artificially reduce plaintiff's days-sales-outstanding ("DSO") figure, (Compl., ¶¶ 112-116); (5) causing plaintiff to falsely characterize its routine operating expenses as non-recurring expenses and to create "cookie jar reserves" by recognizing and reporting certain non-recurring expenses in amounts far in excess of those that plaintiff was likely to incur, resulting in plaintiff's overstatement of reported financial performance, (Compl., ¶¶ 125-126); (6) engaging in insider trading, (Compl., ¶¶ 138-141); (7) failing to cooperate into the investigations of plaintiff's accounting practices, (Compl., ¶ 149); and (8) engaging in "a continuing and concerted course of conduct to manage an enterprise through a pattern of racketeering activity with the purpose and effect of defrauding [plaintiff], falsely inflating [plaintiff's] financial results, garnering improper and undeserved compensation, maintaining [his] position at [plaintiff] and preventing the discovery of [his] misconduct, all at [plaintiff's] expense," (Compl., ¶ 160).

On June 3, 2004, eight (8) of plaintiff's former executives and employees, including Burke, were indicted in connection with their misconduct while employed by plaintiff. (Compl., ¶ 20). Specifically, Burke was charged with one count each of conspiracy to commit securities fraud, securities fraud and making and causing to be made false SEC filings. (Indictment in U.S. v. Razmilovic, et al., no. 04-cr-519, attached as Exhibit B to the Affirmation of Robert W. Topp, Esq. [Topp Aff.]). Plaintiff, however, entered into a non-prosecution agreement requiring it to pay approximately ninety million dollars ($90,000,000.00) to compensate its shareholders, thirty seven million dollars ($37,000,000.00) to the SEC and three million dollars ($3,000,000.00) to the United States Postal Inspection Service Consumer Fraud Fund. (Compl., ¶ 21). In addition, plaintiff took the following remedial steps: dismissal of the employees who committed the wrongdoing; the appointment of new management and the restructuring of its Board of Directors; a commitment to spend more than one hundred million dollars ($100,000,000.00) in new

financial, accounting and management systems; and the appointment of an independent examiner to serve for three (3) years to examine plaintiff's internal controls and financial reporting practices and to report to the government and the new Board of Directors. (Id.)

On February 17, 2005, Burke pled guilty before the Honorable Leonard D. Wexler, to whom the criminal case was previously assigned, to conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and false filings with the SEC in violation of 15 U.S.C. § 78m(a). (Transcript of proceedings on February 17, 2005 ["Plea"], Topp Aff., Ex. C). During the plea allocution, Burke admitted, *inter alia*: (1) that he "conspired with others to violate the federal securities law in a number of ways, including by making and causing to be made false and misleading statements of material facts with respect to the finances of [plaintiff], in reports and documents filed with the [SEC]," (Plea, pp. 11-12); (2) that on or about February 29, 2000, he signed a Form 10K for plaintiff for the year ending December 31, 1999, which was filed with the SEC and which he "knew contained statements with respect to [plaintiff's] revenues and earnings which were false and misleading with respect to material facts," (Plea, p. 12); and (3) that in early 2001, he "caused the creation of backdated false severance letters and presented those backdated false severance letters to [plaintiff's] outside auditors, understanding that the auditors would rely on [those] backdated severance letters in the preparation of [plaintiff's] financial statements," (Plea, p. 12).

During the criminal trial of the remaining defendants in January 2006, Burke testified that he joined plaintiff in October 1987 as the controller. (Transcript of trial proceedings [T.], p. 728, Topp Aff., Ex. D). In 1988, he was promoted to vice president and controller; in 1990 he was promoted to chief accounting officer ("CAO"); in 1998 he was promoted to senior vice president, corporate controller and CAO; in January 2000 he was promoted to senior vice president

4

worldwide operations; and in October 2001 he was the senior vice president of business development. (Id.) As CAO, Burke was responsible for plaintiff's accounting records and the preparation of its financial statements filed with the SEC. (T. 728-729). Burke retired in May 2002, but continued as a consultant for plaintiff regarding an acquisition of a Mexican company until August 2002. (T. 909).

Burke testified that in December 1999, he knew that there was false and misleading information contained in the financial reports (10-K) of plaintiff filed with the SEC, (T. 730, 772-773); and that between December 2000 and January 2001, he "participated with others in creating documentation and support for expenses that were included in the financial statements for the period ending December 2000 which were inappropriate and did not belong in that period of time," (id.). Specifically, Burke testified that between 1995 and 1999 he, and others, created "tango" sheets by "adjust[ing] the numbers through manipulation," to plug the gap between the board forecast, which was "very close" to the Wall Street estimates, and the consolidated actual raw financial numbers for plaintiff. (T. 758-762). According to Burke, "the majority of [the] adjustments were not adjustments that should have been made" and had no basis. (T. 764-765, 770-772). Burke further testified that the "tango" sheets were intentionally withheld from both outside auditors and plaintiff's internal auditors to prevent the adjustments from being challenged. (T. 836-837).

In addition, Burke testified that in December 2000, he, and others, created a list of employees to be included on a list as being terminated because of plaintiff's acquisition of a competitor, Telxon, in order to increase the size of the one-time charge plaintiff could take as a result of the acquisition in order to "bury some of the sins * * * on [plaintiff's] balance sheet," (T. 870). Burke admitted to back-dating severance letters of the employees included on the list in

5

early February 2001, to reflect that notices were sent prior to December 31, 2000, notwithstanding that plaintiff had had no intention of terminating those employees at that time. (T. 884-890).

Burke further admitted to lying to investigators at the beginning of plaintiff's investigation into the accounting practices. (T. 920).

According to Burke, he benefitted financially from the fraud he committed against plaintiff through the receipt of performance bonuses and the exercise of stock options with an approximate dollar value of $5.6 million. (T. 732-734).

B. Procedural Background

On November 9, 2004, plaintiff commenced this action against Burke, and others, alleging claims, *inter alia*, for RICO violations (ninth and tenth causes of action), breach of fiduciary duty (first through third causes of action), unjust enrichment (fourth cause of action) and fraud (eighth cause of action). Plaintiff alleges, *inter alia*: (1) that "Burke committed numerous illegal and fraudulent acts and knew that [plaintiff's] financial results were the product of fraudulent and improper accounting," (Compl., ¶ 6); (2) that Burke engaged in a conspiracy with two (2) other officers of plaintiff to defraud plaintiff and its shareholders by "materially and falsely * * * inflat[ing] the financial results of [plaintiff] so as to misappropriate incentive compensation for themselves and others * * *" and "to coverup their wrongdoing through further accounting fraud, the deception of investigators, the destruction of certain business records and the creation of false documents," (Compl., ¶ 8); and (3) that Burke "intentionally and repeatedly breached [his duty to maintain truthful and accurate public reports, financial statements, and internal business records of plaintiff] over a period of many years." (Compl., ¶ 10). Plaintiff

seeks, *inter alia*, return of all compensation Burke received from plaintiff during the relevant time period; compensatory and punitive damages; treble damages on its RICO claims; costs and attorney's fees.

By order dated November 19, 2004, Judge Wexler, to whom this case was also previously assigned, stayed pre-trial discovery in this action pending resolution of the criminal proceedings. (Doc. No. 3). On December 20, 2006, this case was reassigned to me. By order entered April 10, 2008, following a conference at which Andrew Lawler, Esq. appeared on behalf of Burke, I vacated the stay, without objection, and referred all pre-trial discovery to Magistrate Judge A. Kathleen Tomlinson. (Doc. No. 10; Topp Aff., Ex. F). Although Burke's two remaining co-defendants filed answers to the complaint on May 14, 2008 and May 15, 2008, respectively, (see Doc. Nos. 14 and 15), Burke never filed an answer to the complaint.

On November 25, 2008, Joseph V. DiBlasi, Esq. filed a notice of appearance on behalf of Burke in this action. (Topp Aff., Ex. E). At a subsequent conference held before Magistrate Judge A. Kathleen Tomlinson on October 16, 2009, Mr. DiBlasi appeared on behalf of Burke and represented that his client did not want to be deposed in this action until after he was sentenced on his criminal conviction. (Topp Aff., Ex. G).

At conferences held before me on October 29, 2009, at which counsel for Burke appeared, and December 17, 2009, for which there was no appearance by, or on behalf of, Burke, counsel for plaintiff indicated that he would move for a default judgment against Burke if he did not file an answer. At the latter conference, I set a briefing schedule for the motion, which is reflected on the minute entries on the Court's docket. (Doc. No. 42).

Plaintiff now moves pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure for the entry of a default judgment against Burke, the only remaining defendant in this action. Burke

7

has not opposed the motion.

II. ANALYSIS

Rule 55 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise," a default judgment may be entered. "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability * * *." Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp, 973 F.2d 155, 158 (2d Cir. 1992). "Even if a party appears in a case, if that party by its subsequent actions plainly abandons its defense, * * *, such actions can warrant the judgment of default." Eastern Freight Ways, Inc. v. Eastern Motor Freight, Inc., No. 02 Civ. 3138, 2003 WL 21355486, at * 2 (S.D.N.Y. June 11, 2003). In fact, Rule 55(b)(2) references the following procedure for obtaining a default judgment where a party has appeared in the action: "If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application [for a default judgment] at least 3 days before the hearing."

In determining whether to enter a default judgment, a court should consider the following factors: (1) the willfulness of the default; (2) whether the defendant has a meritorious defense; and (3) the prejudice, if any, to the moving party if the motion were denied. See U.S. v. DiPaolo, 466 F.Supp.2d 476, 482 (S.D.N.Y. 2006); Arthur F. Williams, Inc. v. Helbig, 208 F.R.D. 41, 44 (E.D.N.Y. 2002). The determination of whether to enter a default judgment is left to the sound discretion of the district court. See Shah v. New York State Dep't of Civil Service, 168 F.3d 610, 615 (2d Cir. 1999).

A.  Willfulness

In the context of a default, willfulness means "conduct that is more than merely negligent or careless." S.E.C. v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998). "The conduct of counsel or the litigant must be egregious and not satisfactorily explained." Helbig, 208 F.R.D. at 44 (internal quotations and citation omitted).

Although Burke has had over twenty (20) months since the stay was vacated within which to answer the complaint, he has failed to do so, despite being informed of plaintiff's intent to seek a default judgment against him. Moreover, Burke failed to oppose the instant motion for a default judgment against him, despite service of the notice of motion and supporting papers on his counsel of record on December 31, 2009, and he has never expressed an intention to serve and file a responsive pleading in the future. Accordingly, Burke's default in this action is willful. See, e.g. DiPaolo, 466 F.Supp.2d at 482 (finding grounds for a default judgment where although the defendant attended at least one court appearance, it failed to answer the complaint and expressed no intention to do so at a future time); Trustees of CWA Local 14156-Printers, Publishers & Media Workers Benefit Fund v. Rumar Typesetting and Design, No. 05 Civ. 1455, 2006 WL 1227183, at * 2 (S.D.N.Y. May 5, 2006) (finding grounds for a default judgment where, *inter alia*, although defendants participated in at least one conference, consented to trial before the magistrate judge, and engaged in settlement negotiations, they failed to answer the complaint and ignored the Court's direction to provide further information regarding their request for an extension of time to appear).

B.  Meritorious Defense

To establish a meritorious defense, the defendant "need not establish his defense

9

conclusively, but must present evidence of facts that if proven at trial, would constitute a complete defense." McNulty, 137 F.3d at 740 (internal quotations and citation omitted). Burke has proffered no potentially viable defense that would preclude entry of a default judgment against him and, indeed, has not opposed the instant motion. Moreover, I can discern no viable defense from the record, particularly since Burke admitted to his unlawful conduct during both his plea allocution and the criminal proceedings of his co-conspirators.

C. Prejudice

Plaintiff would be prejudiced by the denial of its application for a default judgment since, *inter alia*, Burke is the only remaining defendant in this action; this action is more than five (5) years old; discovery has not yet been completed based, in part, on Burke's stated reluctance to proceed until he is sentenced on his criminal conviction; and plaintiff would be forced to prosecute a case in which it is unaware of Burke's defense. Moreover, it is unclear what additional steps plaintiff could take to prompt Burke to file an answer or otherwise respond to the complaint, so a denial of its motion would effectively defeat its valid claims against Burke. See, e.g. Trustees of the CWA, 2006 WL 1227183, at * 2 (S.D.N.Y. May 5, 2006) (finding prejudice to the plaintiff were there were no additional steps available to it to secure relief in this Court).

Accordingly, plaintiff's motion for a default judgment on the issue of Burke's liability is granted.

D. Damages

"While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." Greyhound, 973 F.2d at

10

158. Accordingly, the trial scheduled to commence before me on March 1, 2010 is converted to an inquest on damages.

III. CONCLUSION

Plaintiff's motion for a default judgment against Burke is granted on the issue of liability and an inquest on damages will be held before me on March 1, 2010.

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated: February 24, 2010
Central Islip, New York